# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

**MICHAEL W. WYNNE,**
**SECRETARY**                                                 **Case No. 3:06-cv-122**
**UNITED STATES AIR FORCE**

                **Plaintiff,**

**-vs-**

                                              **Judge Thomas M. Rose**

**COMMEMORATIVE AIR FORCE,**

                **Defendant.**

_____

### ENTRY AND ORDER GRANTING THE USAF'S MOTION FOR SUMMARY JUDGMENT (Doc. #29); OVERRULING THE COMMEMORATIVE AIR FORCE'S MOTION FOR SUMMARY JUDGMENT (Doc. #33) AND TERMINATING THIS CASE

_____

This dispute is between Michael W. Wynne, Secretary of the United States Air Force (the "USAF") and the Commemorative Air Force (the "CAF"). The dispute is about the right to possess a F-82-B Twin Mustang aircraft serial number 44-65162 (the "F-82").

The USAF seeks a declaratory judgment that the CAF violated the terms of a certificate (the "Certificate") and that the Director of the U.S. Air Force Museum timely notified the CAF that he was exercising an option under the Certificate by seeking physical possession of the F-82. (Compl. ¶ 21.) The USAF also claims that the CAF breached the terms of the Certificate and seeks return of the F-82 to the National Museum of the United States Air Force (the "NMUSAF"). (Id. ¶ 25.) Finally, the USAF seeks to have the F-82 returned to the NMUSAF under a replevin claim.

Neither Party disputes that the issues in this case are within the Court's subject matter jurisdiction under 28 U.S.C. § 1345. The Plaintiff is the Secretary of the United States Air Force acting in his official capacity seeking to recover property that allegedly belongs to the United States Air Force. Proper venue has been previously determined to lie within the Southern District of Ohio.

Both the USAF and the CAF have filed Motions for Summary Judgment. (Doc. #29, 33.) These Cross-Motions for Summary Judgment are now both fully briefed and ripe for decision. A procedural background will first be set forth followed by a factual background, the standard of review for motions for summary judgment and an analysis of the Cross-Motions.

## PROCEDURAL BACKGROUND

On April 3, 2006, the CAF filed a complaint for declaratory relief and equitable estoppel in the United States District Court for the Central District of California (the "California Action"). Twenty-three days later, the USAF filed the Complaint in this case for a declaratory judgment that the CAF violated the terms of a conditional release, for breach of contract, and for replevin (the "Ohio Action").

On August 28, 2006, this Court stayed the Ohio action pending a ruling on the CAF's action in California. The USAF filed two successive motions to dismiss the California Action for lack of subject matter jurisdiction, both of which were granted with leave to amend. Thereafter, as a result of concerns about establishing subject matter jurisdiction, the CAF elected not to further amend its complaint in the California Action and stipulated to a voluntary dismissal without prejudice.

The California Action was dismissed on April 27, 2007. This Court lifted the stay in the Ohio Action and the CAF answered the Complaint filed by the USAF in the Ohio Action. The CAF next moved to transfer the Ohio Action to the United States District Court for the Western District of Texas or the United States District Court for the Central District of California. This Motion was denied and the Parties proceeded to complete discovery. Following discovery, both Parties filed a Motion for Summary Judgment. It is these Cross-Motions that are now before the Court.

## FACTUAL BACKGROUND

### The Plaintiff

The Plaintiff in this matter is the Secretary of the United States Air Force who, until very recently, was Michael W. Wynne. The Secretaries of the military services are authorized by Congress to loan books, manuscripts, works of art, historical artifacts, drawings, plans, models and condemned or obsolete combat material to various specified entities including museums and historical societies. 10 U.S.C. § 2572. The Secretary of the Air Force has delegated his authority to loan all Air Force and former Army Corps aircraft and equipment to the NMUSAF which is located at Wright Patterson Air Force Base.

In an attempt to gain control over the disposal of equipment and supplies no longer needed by the armed forces, the Department of Defense issued a Defense Disposal Manual. The 1964 Defense Disposal Manual (the "Manual") was designated DSAM 4160.1.[1] (Plt. Mot. Summ. J. Attach. 1.) The Manual places restrictions upon the methods of donation and types of surplus material which can be donated. In general, the Manual calls for the destruction of all

---

[1] Citations in this Opinion are to DSAM 4160.1 as it is believed to have existed in early 1966.

fighter and bomber aircraft before they could be sold for scrap. A limited exception was made for donations to certain types of civic and veterans groups as well as non-profit museums.

<u>The Defendant</u>

The CAF is the Defendant in this matter. The CAF, formerly known as the Confederate Air Force, operates and displays World War II-era combat aircraft as well as aircraft from subsequent eras. It is chartered as a non-profit Texas Corporation with its principal place of business in Midland, Texas.

There are three other entities in Midland, Texas associated with the CAF. Each, according to the CAF, is a separate corporate entity that plays a separate role in administering the assets to fulfill the CAF mission. One such entity is the American Airpower Heritage Museum ("AAHM") which accepts aircraft on loan and is responsible for those aircraft on static display in the museum. (Declaration of Delmar Joe Cowan ("Cowan Decl.") ¶ 3 Mar. 28, 2008.) Another entity, the American Airpower Heritage Flying Museum ("AAFM") holds title and is responsible for aircraft designated for return to flying condition. (Id.) The third entity is the American Airpower Heritage Foundation ("AAHF") which is established as an endowment facility. (Id.)

<u>The Aircraft</u>

The subject of this dispute is an F-82. The F-82 is a North American P-82 Twin Mustang fighter, serial number 44-6512.[2] It was used at the end of World War II and in the Korean War.

---

[2]The F-82 was earlier designated as a P-82. The "P" is the designation for a pursuit aircraft and the "F" is the designation for a fighter aircraft.

In the summer of 1954, the Navy determined that the F-82 was no longer needed and returned it to the USAF. (Plt. Mot. Summ. J. Attach 2, Ex. 1.) The USAF determined that it no longer needed the F-82 so it was transferred to the Air Force Museum.[3] In October of 1954, the Air Force Museum released the F-82 to Lackland Air Force Base in San Antonio, Texas ("Lackland AFB"), for use in Lackland AFB's museum program. (Id. Attach 2, Ex. 2.) The F-82 remained at Lackland AFB on static display at an outdoor location until 1966.

Transfer of the F-82

In the Spring of 1966, the CAF became interested in acquiring an F-82 for its museum. (Id. Attach. 2, Ex. 4.) In March of 1966, Robert W. Harper, of the CAF, wrote Major General H. K. Mooney, Commander of the Military Training Center at Lackland AFB, asking if an F-82 could be transferred to the CAF. (Id.) General Mooney replied by letter of April 8, 1966, stating, ""[w]e have already advised the Air Force Museum at Wright-Patterson that Lackland has no objection to the transfer of one of our F-82's to the CAF." (Id.) In this letter, General Mooney suggested that the CAF make a formal request to the Air Force Museum for an F-82. (Id.)

On April 14, 1966, Colonel William F. Curry, then the Director of the Air Force Museum, sent a letter to Mr. H.C. Woodburn, of the Aerospace Vehicle Distribution Office at Wright-Patterson AFB, indicating that an F-82 was currently on loan to Lackland AFB and could be donated if authorized by the Lackland AFB Commander. (Id. Ex. 5.) Colonel Curry also requested that Mr. Woodburn provide disposal action documents so that property records could be adjusted accordingly. (Id.)

---

[3]The Air Force Museum is now known as the NMUSAF.

The record does not include a document specifically approving the donation by the Lackland AFB Commander. However, the donation must have been approved because, on April 15, 1966, Mr. Woodburn wrote to the Lackland AFB Commander authorizing release of the F-82 to the CAF. (Id. Ex. 6.) Mr. Woodburn also requested that the F-82 be inspected before it was released to insure that no explosive devices were installed. (Id.) Finally, Mr. Woodburn requested that two copies of DD Form 1149 be signed by authorized representatives of the CAF and returned to him when the F-82 was actually released to the CAF. (Id.)

In a separate letter to CAF Colonel Nolen, Mr. Woodburn attached a copy of the April 15 letter to the Lackland AFB Commander and two copies of a donation certificate for the F-82. (Id. Ex. 7.) Mr. Woodburn requested that one copy of the donation certificate be returned to him. (Id.)

On April 18, 1966, Colonel Nolen, then the Confederate Air Force President, signed a donation certificate for the F-82 (the "Certificate").[4] (Id. Ex. 8.) The Certificate states,

> In order to induce the United States Air Force (hereinafter referred to as the "Donor") to donate a F-82 aircraft, SN 44-65162 (hereinafter referred to as the "donated property") to be used for display to Confederate Air Force Museum (hereinafter referred to as the "Donee"), the Donee represents and warrants that it is a nonprofit chartered museum and that the Donee accepts the donation of the donated property subject to the following terms and conditions, the due observance of which is essential to the validity and continuance of the donation:

---

[4]Sometime after 1972, the Department of Defense policy covering donations of aircraft changed from one of conditional donation with a reversionary clause to loans. However, the museums and educational groups to which aircraft had previously been donated were not forced to return or alter the existing certificates. Instead, the museums and educational groups were notified of the change and if they elected not to modify their donation certificate, they were merely reminded that the Air Force museum was responsible for these aircraft and must be contacted regarding disposition of the aircraft. This Notice was sent by letter to Robert L. Griffin, the Assistant to the Executive Director of the CAF on May 2, 1980. (Id. Ex. 9.)

1. The Donee shall use the donated property in a careful and prudent manner and shall carefully maintain and make such repairs as are necessary to keep the donated property in a clean and safe condition, so that its appearance and use will not adversely reflect upon the Donor.

2. If at any time the donated property is no longer used for the purpose and/or end use for which it is donated or retention of the property is no longer desired, title to the donated property shall, at the option of the Government, revest in the Air Force; provided however, that if the Government does not exercise said option within 60 days after receipt of written notice, it shall be deemed that the Government does not elect to exercise the option, however, the Donee agrees prior to disposing of the donated property, to demilitarize the property to the extent required by the Government policy in effect at the time of disposal.

3. The Donee further agrees to indemnify, save harmless, and defend the Government from and against all claims, demands, actions, liabilities, judgments, costs and attorney's fees arising out of, claimed on account of, or in any manner predicated upon personal injury, death or property damages caused by or resulting from the possession and/or use of the donated property.

4. Delivery of the donated property to the Donee, and the repossession of all or any part of the donated property by the Donor, shall be at no cost or expense to the Donor and the Donee shall pay all freight and transportation charges.[5]

(Id.) Nolen's signature was verified by A. L. Chubb, Jr., Secretary of the Confederate Air Force.

Possession of the F-82 was transferred pursuant to a DD Form 1149. (Def. Mot. Summ. J. Ex. G.) The DD Form 1149 is a "Requisition and Invoice Shipping Document" that indicates that the F-82 was shipped from Lackland AFB to the CAF pursuant to the April 15, 1966 letter releasing the F-82. (Id.)

Almost immediately after taking custody of the F-82, the CAF began preparations to move it across the road from Lackland AFB to Kelly AFB.[6] ((Plt. Mot. Summ. J. Attach 2, Ex. 12.) The CAF also began seeking permission from the USAF to fly the F-82 from Kelly AFB to "Rebel Field" in Mercedes, Texas where they could complete a more extensive renovation.

---

[5]The Certificate indicates that it was a form created by the Military Aircraft Storage and Disposition Center at Davis-Monthan AFB, Arizona.

[6]Lackland AFB was an academic training base and did not have a runway.

On June 7, 1966, General Mooney, the Lackland AFB Commander, informed Colonel Nolen of the CAF that the CAF would need permission from USAF Headquarters and an FAA certification of airworthiness to fly the F-82. (Id. Ex. 13.) Permission from the Air Force was required because the F-82 was a donated aircraft. (Id.)

On August 24, 1967, Colonel Nolen wrote to USAF Headquarters and asked permission to fly F-82 from Kelly AFB to the CAF Museum at Mercedes, Texas. (Id. Ex. 15.) In this letter, Nolen indicates that the CAF's primary mission is "to restore and maintain in flying condition a complete collection of WWII combat aircraft." (Id.) Nolen also indicates that the F-82 would be restored to its original condition and "made available for display and flight with other aircraft of the CAF fleet." (Id.)

USAF Colonel Roberts wrote back to Nolen indicating that Nolen's request for permission to fly the F-82 had been received. (Id. Ex. 14.) Colonel Roberts also informed Nolen that the Air Force General Counsel had determined that all surplus aircraft donated pursuant to 10 U.S.C. § 2572 must contain a "no fly" clause and that Air Force policy must be in accordance with this determination. (Id.) However, Colonel Roberts indicated that, because of the timing of the donation of the F-82 and the Air Force's determination, he was referring the request to fly the F-82 from Kelly AFB to Mercedes, Texas to the USAF General Counsel's office. (Id.)

On October 16, 1967, the USAF General Counsel determined that, even if a "no fly" provision was determined to be applicable to the F-82, permission to fly the F-82 could be granted by "the appropriate Air Force element." (CAF Mot. Summ. J. Ex. O.) The Assistant Deputy General Counsel also said, "we see no bar to granting such permission in this case,

assuming that all appropriate safeguards have been taken." (Id.) This opinion was offered in regard to the CAF's request to fly the F-82 from Kelly AFB to Mercedes, Texas. (Id.)

On January 13, 1968, General Gerrity, Commander of the Air Force Logistics Command, sent a letter to the CAF's Victor Agather informing him that the CAF "is under no Air Force restriction on flying the airplane [F-82]." (Plt. Mot. Summ. J. Attach 2, Ex. 17.) On January 4, 1968, Nolen had written to Mr. Royal D. Frey, the Chief of the Air Force Museum Research Division, that the F-82 had been repaired and the CAF now has permission to fly it. (Id. Ex. 17.)

Another of the items which had to be satisfied before the F-82 could be flown was Federal Aviation Administration ("FAA") certification and licensing. (Id. Ex. 18.) To assist the CAF in obtaining FAA certification of the F-82, Mr. Woodburn certified that the F-82 had been donated by the USAF to the CAF and that the CAF had been authorized to fly the F-82 from Kelly AFB to Mercedes, Texas, under provisions of appropriate civil flight regulations. (Id. Ex. 19.) Utilizing the transfer certificate provided by Mr. Woodburn, the CAF was able to register the F-82 with the FAA and fly it.

The CAF flew the F-82 on numerous occasions from the early 1970s until October of 1987 when it crashed.[7] (Cowan Decl. ¶ 6.)  After the crash, the CAF wanted to restore the F-82 to flying condition. (Id.) To that end, sponsors were sought to pay for the restoration. (Id.) For example, the F-82 was transported by the USAF on a C5A to El Cajon, California since there

---

[7]Barbara Young, who held various positions at the Air Force Museum including working in Collections Management from 1987 to the early 1990's, testifies that the Air Force Museum was aware that the CAF had flown the F-82, that the CAF had crashed the F-82 and that the CAF could not get parts for the F-82 to get it flying again. (Deposition of Barbara Young ("Young Dep.") 29-30 Feb. 26, 2008.) She does not remember when the Air Force Museum would have first known this information. (Id. at 29.)

was a potential sponsor in that area. (Id.) However, this sponsor eventually withdrew funding. (Id.)

In 1991, the ownership and title to the F-82 was transferred from the CAF to the AAHFM. (Id. ¶ 5.) Thereafter, the operation and maintenance of the F-82 by the CAF was pursuant to a written lease between the CAF and the AAHM. (Id.) Cowan testifies that the Air Force Museum was aware of this ownership transfer and did not object. (Id.)

The CAF continued to seek funding to restore the F-82. (Id. ¶ 8.) The CAF came into contact with NPA Holdings, LLC ("NPA Holdings") who offered to exchange a fully refurbished P-38 aircraft for the F-82. (Id.) In September of 2002, AAHM and NPA Holdings entered into an exchange agreement. (Id.)

Major General (retired) Charles Metcalf, Director of the NMUSAF, learned of the exchange in the January 2003 issue of the magazine "Air Classics." (Plt. Mot. Summ. J. Attach 2, Ex. 11.) He then informed Mr. Bob Rice ("Mr. Rice"), the CAF's Executive Director, in writing that the attempted sale of the F-82 violated the terms of the Certificate. (Id.) In the letter dated December 2, 2002, General Metcalf indicates that the F-82 was conditionally donated to the CAF Museum and the donation certificate contains the provision that the title of the F-82 would revert back to the USAF, at the Government's option, if the F-82 was no longer used for the purpose and/or end use for which it was donated or retention was no longer desired. (Id.) In addition, General Metcalf indicates that he considers the information contained in the January 2003 issue of Air Classics as written notice that the CAF no longer wishes to retain the F-82. (Id.) Finally, the letter is considered by General Metcalf as formal notification that the NMUSAF is exercising the option to retain title to the F-82. (Id.)

Then, out of an abundance of caution, the CAF cancelled the agreement to trade the F-82. (Cowan Decl. ¶ 10.) However, neither the CAF nor the AAHM agree with the Government's position that the F-82 should be returned. (Id.)

From late in 2002 until April of 2006, the USAF, represented primarily by General Metcalf, and the CAF, represented primarily by Mr. Rice, attempted to agree on ownership, possession, and operation of the F-82. The discussions between these individuals did not result in an agreement. The F-82 has not been returned to the NMUSAF and remains with the CAF. (Id.)

The standard of review will next be set forth followed by an analysis of the Cross Motions for Summary Judgment. The Cross Motions for Summary Judgment will be analyzed for each of the USAF's three claims for relief.

**STANDARD OF REVIEW FOR MOTIONS FOR SUMMARY JUDGMENT**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the non moving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be

evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

The USAF's Complaint involves claims brought pursuant to Ohio law. In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001)(quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)).  Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms. Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)). The analysis next turns to Count One of the USAF's Complaint.

## COUNT ONE: DECLARATORY JUDGMENT

In Count One of its Complaint, the USAF seeks a declaratory judgment that the CAF violated the terms of the Certificate and that the Director of the NMUSAF timely notified the CAF that he was exercising the option under the Certificate by seeking physical possession of the F-82. The USAF also seeks a determination that the CAF must abide by the terms of the Certificate.

### The Certificate

The Certificate was the basis for the transfer of the F-82 from the USAF to the CAF. This neither Party seriously disputes. Further, the Certificate is signed by L. P. Nolen as President of the CAF and this signature is acknowledged by A. L. Chubb, Jr., Secretary of the CAF.

The Certificate provides that the F-82 is being donated to the CAF to be displayed in the CAF museum. In return for receiving the F-82, the CAF agrees to abide by certain terms and conditions that are specified in the Certificate.

One such term and condition is that the CAF must use the F-82 "in a careful and prudent manner" and must "carefully maintain and make such repairs as are necessary to keep the [F-82] in a clean and safe condition." The purpose of this term and condition is so that the appearance of the F-82 will not adversely reflect upon the USAF.

The second term and condition is that, if at any time the CAF no longer uses the F-82 for the purpose for which it was donated or the CAF no longer wishes to retain the F-82, the USAF has the option of regaining title to the F-82. The USAF has sixty (60) days to exercise this option to regain title after being notified in writing that the CAF no longer wishes to use the F-82 for the purpose for which it was donated. Finally, the CAF agrees that, if the USAF does not

-14-

exercise the option for return of the F-82, the CAF will, before disposing of the F-82, "demilitarize" the F-82 to the extent required by Government policy in effect at the time of disposal.

The third term and condition is not relevant to the issues raised in this matter. The fourth and final term and condition provides that the delivery of the F-82 to the CAF and the repossession of the F-82 from the CAF will be at no cost to the USAF and the CAF will pay all freight and transportation charges.

In sum, the USAF donated the F-82 to the CAF under certain terms and conditions. One term and condition was that the CAF was to keep the F-82 in a clean and safe condition. Another term and condition was that, if the CAF no longer wished to display the F-82 in its museum or no longer wished to keep the F-82, the CAF must notify the USAF of such decision in writing and the USAF had sixty (60) days to decide whether to have the F-82 returned to the USAF. The final relevant term and condition was that all freight and transportation costs for the initial transfer and subsequent return, if elected, to the USAF were to be born by the CAF.

The CAF offers several arguments as to why the terms of the Certificate are not enforceable and, therefore, why summary judgment should not be granted to the USAF on Count One of the USAF's Complaint. Each will be addressed seriatim.

<u>Elements of Lease Contract Not Established</u>

The CAF first argues that the USAF's Motion for Summary Judgment does not establish the essential element of a lease contract. This argument is based upon the CAF's interpretation of the USAF's allegations that the transfer of the F-82 was a lease.

The transfer of the F-82 was governed by the Certificate. The Certificate is the legal document that sets forth the obligations between the Parties with regard to the F-82. In Count One, the USAF seeks, among other things, a determination that the CAF must abide by the terms of the Certificate and return the F-82.

The content of the Certificate is of importance here, not the description of the Certificate that the CAF or the USAF may wish to use. Whether the Certificate can be called a lease is immaterial. It's the Certificate to which the Court looks to determine the obligations of the Parties.

A resolution of the dispute that is now before the Court must begin with the Certificate. Arguing that the Certificate is a lease and then arguing that the Certificate does not include the essential elements of a lease is not only circular but it is also irrelevant.

<u>Transfer Was a Donation</u>

The CAF also argues that the transfer of the F-82 was a donation. This argument is based upon the CAF's conclusion that the transfer was not a lease and the title of the F-82 "clearly" transferred to the CAF. However, as above, a resolution of this dispute must begin with the Certificate, irregardless of what the Certificate is called by either Party.

According to the terms of the Certificate, the transfer of the F-82 was a donation. However, the donation is not without terms and conditions that must be followed.

<u>Certificate Is Ambiguous</u>

The CAF next argues that the Certificate is ambiguous for several reasons. An ambiguity exists where a contract term cannot be determined from the four corners of the contract or where

the contract language is susceptible to two or more reasonable interpretations. *Potti v. Duramed Pharmaceuticals*, *Inc.*, 938 F.2d 641, 647 (6th Cir. 1991).

First, the Certificate is ambiguous, according to the CAF, because it was intended for the donation of military uniforms and uniform accessories. In support of this argument, the CAF points to a "Certificate Required When Distinctive Uniform Items Are Donated Or Transferred" found at DSAM 4160.1 p. 3-XV-39. The language in the certificate to be used when distinctive uniforms are donated or transferred is very similar to the language used in the Certificate. However, the use of similar language does not render the language used in the Certificate capable of two or more reasonable interpretations.

The CAF next argues that the Certificate is ambiguous because the USAF remained silent in the face of the CAF's exhibition flying of the F-82. This silence, according to the CAF extinguished the USAF's option to re-vest title. Remaining silent while the CAF flew the F-82 does not render the language of the Certificate capable of two or more reasonable meanings nor does it lead to the conclusion that a contract term cannot be determined from the four corners of the contract.

The CAF next argues that the term "written notice" found in the Certificate is ambiguous. This argument is based upon the USAF's contention that the magazine article was written notice. However, the USAF's contention, whatever it may be, does not make the language in the Certificate requiring written notice ambiguous.

Finally, the CAF argues that the Certificate is ambiguous because of language in an "Assurance of Compliance With the Department of Defense Directives Under Title VI of the Civil Rights Act of 1964" which was attached to the Certificate. Again, this Court fails to see

-17-

how the Assurance of Compliance attached to, but executed separately and for a different purpose, from the Certificate renders any of the language in the Certificate capable of two or more reasonable meanings.

The CAF has been unable to create an ambiguity in the Certificate where none exists. Interpretation of the Certificate by the Court continues to be the first and most important step in the resolution of this dispute.

Complaint Is Moot

The CAF next argues that the USAF's Complaint is moot because there is no controversy between the USAF and the CAF regarding the F-82. The CAF argues that it alone has title to the F-82 because the F-82 was a donation and because the Federal Aviation Administration ("FAA") Registration Certificate for the F-82 contains no indication that the USAF has any right of ownership to the F-82. According to the CAF, it has possession and title to the F-82 and desires to continue retention of the F-82.

Upon receiving word from General Metcalf that the transfer of the F-82 to NPA Holdings violated the terms and conditions of the Certificate, the CAF caused the F-82 to be transferred back to the CAF.[8] The CAF does not now indicate what it intends to do with the F-82 other than retain it.

It is undisputed that the CAF now has possession of the F-82. It is also undisputed that the FAA Registration Certificate for the F-82 contains no indication that the USAF has any right of ownership to the F-82.

_____

[8]The CAF attempted to sell an aircraft to the NPA that the CAF did not have a right to sell.

There is a dispute as to whether the transfer of the F-82 was a donation. However, as discussed above, the transfer of the F-82 to the CAF was not an outright donation but was a donation subject to the terms and conditions of the Certificate.

Regarding title to the F-82, the USAF now argues that it was the CAF that "forgot" to include the residual interest of the USAF when it registered the F-82 with the FAA. More importantly, the FAA Registration Certificate does not establish anything in a dispute between two parties claiming ownership of an aircraft. 49 U.S.C. § 44103(c)(an FAA certificate of registration is "not evidence of ownership of an aircraft in a proceeding in which ownership is or may be in issue").

Therefore, the CAF has not presented reliable evidence that it alone has ownership of the F-82. Further, by attempting to sell the F-82 without notifying the USAF, the USAF argues that the CAF has violated the terms and conditions of the Certificate which formed the basis for the USAF's transfer of the F-82 to the CAF and the CAF argues that it has not. Therefore, there is a real case or controversy and the USAF's Complaint is not moot.

### Inequitable Forfeiture

The CAF next argues that, because of the investment of time and resources in the F-82 by the CAF from 1966 to the present, an order to transfer the F-82 from the CAF to the USAF would amount to an inequitable forfeiture. The CAF further argues that the USAF's alleged reversionary interest did not expressly prohibit transfer of the F-82 by the CAF.

This argument too is unavailing. The terms and conditions of the Certificate require that title to the F-82 revests in the USAF when the CAF no longer uses the F-82 for the intended purpose or when the CAF no longer desires to retain the F-82. If the USAF receives notice that

the CAF no longer uses the F-82 for the intended purpose or that retention of the F-82 is no longer desired, the USAF could decline to receive the F-82 back.

Presumably the CAF was well aware of the terms and conditions set forth in the Certificate when it made its decisions to invest time and resources into the F-82. It presumably knew that when the CAF no longer used the F-82 for the intended purpose or no longer desired to retain the F-82, the USAF could elect to have the F-82 returned to it. A return of the F-82 pursuant to the terms and conditions of the Certificate, of which all involved were presumably aware, can hardly be termed inequitable.

While the Certificate does not expressly prohibit transfer of the F-82 by the CAF, it does prohibit transfer of the F-82 unless the USAF declines to receive the F-82 back. While the form of the notice is questionable, it is undisputed that the USAF did not expressly decline to receive the F-82 back. In fact, when the USAF learned of the transfer of the F-82 from the CAF to NPA Holdings, the USAF demanded return of the F-82.

In an effort to settle this dispute, General Metcalf offered to loan the F-82 to the CAF for static display purposes only. The CAF has apparently elected to decline this offer.

The CAF also argues that forfeiture would be inequitable because the USAF explicitly gave its approval for the CAF to fly the F-82 and had knowledge of the F-82's flying status and failed to object. In support of this argument, the CAF cites two documents. The first is the 1966 Release and DD Form 1149. This document is titled "Requisition and Invoice Shipping Document" and is merely a record that the F-82 was transferred from Lackland AFB to the CAF pursuant to the April 15, 1966 letter releasing the F-82. It is not any indication of ownership or indication that the Certificate was no longer valid.

The second document cited by the CAF is the 1968 Transfer Certificate. In the document referred to by the CAF as the 1968 Transfer Certificate, the USAF certified that the F-82 had been donated by the USAF to the CAF and that the CAF had been authorized to fly the F-82 from Kelly AFB to Mercedes, Texas, under provisions of appropriate civil flight regulations. This too does not represent a transfer separate from the Certificate and only authorizes a flight from Kelly AFB to Mercedes, Texas. Also, the 1968 Transfer Certificate cannot be a completely new donation because the Air Force General Counsel had determined in June of 1967 that all aircraft donated under 10 U.S.C. § 2572 after that date had to contain a no-fly clause and the 1968 Transfer Certificate does not contain a no-fly clause.

As to the USAF's knowledge of the F-82's flying status, the USAF did not object while the CAF flew the F-82 to many venues beyond Mercedes, Texas. However, this failure to object does not obviate the terms and conditions of the Certificate. The CAF's failure to comply with the purpose of the donation as set forth in the Certificate does not eliminate the USAF's reversionary interest.

Further, even if General Gerrity and other USAF personnel had intended to transfer entire ownership of the F-82 to the CAF, such an act would be beyond their powers as agents of the Government. This is because there are restrictions found in DSAM 4160.1 on the disposition of surplus Government property, including aircraft, and General Gerrity and other Air Force personnel did not have the authority to transfer ownership of the F-82 to the CAF.

The only exception to aircraft demilitarization by mutilation in DSAM 4160.1 is donation to various organizations identified in 10 U.S.C. § 2572 with the requirement that all such donations be made subject to a condition which prohibits further disposition without prior

approval of DSA or the Military Service concerned. Thus, no one other than the Secretary of the Air Force or Congress has the authority to release any restrictions on the use of surplus military equipment.

A contract with the Government cannot be enforced unless the representative who entered into or ratified a contract on behalf of the Government had actual authority to make the promise therein and bind the Government. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947); *Land Grantors In Henderson, Union and Webster Counties, Kentucky v. United States*, 64 Fed. Cl. 661, 702 (Fed. Cl. 2005). Since the USAF personnel involved and knowledgeable about the flying condition do not have authority to give away aircraft, if they did so, their actions would be outside of the law and ineffective.

<u>Laches and Estoppel</u>

The CAF next argues that the USAF should be estopped from seeking return of the F-82 because the CAF invested countless manhours and sponsor dollars to bring the F-82 into flying condition with knowledge and consent of the USAF. Assuming that the defenses of laches and estoppel are available against the Government, which is questionable at best, this is the same argument that is addressed above under inequitable forfeiture with the same result.

<u>Reversionary Interest Unrecorded, Waived and/or Superceded</u>

In its Motion for Summary Judgment, the CAF argues that the USAF's reversionary interest is invalid because it was unrecorded, waived and/or superceded. However, the USAF's reversionary interest is recorded in the Certificate. Further, the CAF has not shown that the USAF was responsible for recording its reversionary interest as part of the FAA Registration

Certificate, a document that is meaningless with regard to ownership interest in the F-82. Finally, the CAF's arguments regarding waiver and supersession are, as discussed above, unavailing.

<u>Summary</u>

The Certificate and its terms and conditions govern the transfer of the F-82. The CAF has presented no persuasive arguments to the contrary.

Further, the CAF presumably no longer needed the F-82 and attempted to dispose of it without first notifying the USAF. Yet the terms and conditions contained in the Certificate require the CAF to notify the USAF when it no longer wished to display the F-82 in its museum or no longer wished to keep the F-82. Therefore, the CAF violated the terms and conditions of the Certificate.

## COUNT TWO: BREACH OF CONTRACT OR CONDITIONAL LEASE

In Count Two of its Complaint, the USAF argues that the CAF breached the terms of the conditional lease. As a result, the USAF seeks a judgment directing possession of the F-82 be returned to the NMUSAF and directing that all costs of recovering the F-82 and transporting it to an appropriate location be assigned to the CAF.

The CAF has not responded directly to the USAF's Motion for Summary Judgment on Count Two of its Complaint nor has the CAF specifically discussed Count Two in its Motion for Summary Judgment. However, the CAF's arguments analyzed above apply to Count Two with the same results.

The Certificate governs the transfer of the F-82 and the CAF has violated the terms and conditions of the Certificate. Further, the USAF has notified the CAF that the USAF is exercising its option under the terms and conditions of the Certificate for return of the F-82 to

the USAF. Therefore, the F-82 must be returned to the USAF. Finally, the terms and conditions of the Certificate require that the CAF bear the freight and transportation costs.

## COUNT THREE: REPLEVIN

In Count Three of its Complaint, the USAF seeks a judgment directing the return of the F-82 to the NMUSAF's possession and control. In this Count, the USAF also seeks a judgment directing that all expenses be taxed against the CAF.

An action for replevin requires proof of ownership or right to possession. *Smith v. United States*, 293 F.3d 984, 987 (7th Cir. 2002); *Service Transport Co. v. Matyas*, 112 N.E.2d 20 (Ohio 1953). In this case, the CAF argues that the USAF has no proof of ownership or right to possession of the F-82 and is, therefore, not entitled to possession of the F-82.

The Certificate which governs the transfer of the F-82 gives the USAF the right to possess the F-82. The terms and conditions of the Certificate provide that, if the CAF no longer uses the F-82 for its intended purpose or no longer needs the F-82, the USAF is to be notified and has the option of having the F-82 returned to the USAF. The CAF presumably no longer needed the F-82 and sold it without first notifying the USAF. The USAF has notified the CAF that it wishes to exercise its option for return of the F-82. Therefore, the USAF is entitled to possession of the F-82.

The CAF's possession of the F-82 combined with an intention to keep the F-82 is not enough to overcome the USAF's replevin action. Unless some other arrangements are made with the approval of the USAF, the CAF must return the F-82 to the USAF and the CAF is to bear the freight and transportation costs.

## SUMMARY

The Certificate governs the transfer of the F-82 from the USAF to the CAF. The CAF has not shown otherwise.

One of the terms and conditions of the Certificate requires the CAF to notify the USAF in writing if the CAF no longer desires to use the F-82 for display or no longer desires to retain the F-82.  This the CAF did not do. The CAF sold the F-82 to NPA Holdings.

The USAF found out that the CAF had sold the F-82 and demanded its return. The CAF has now regained possession of the F-82 and, according to one of the terms and conditions of the Certificate, must return it to the USAF unless other arrangements satisfactory to the USAF can be made. Finally, according to another of the terms and conditions in the Certificate, the freight and transportation charges associated with the return of the F-82 are to be born by the CAF.

There are no genuine issues of material fact and the USAF is entitled to judgment as a matter of law. The USAF's Motion for Summary Judgment (doc. #29) is GRANTED. The CAF's Motion for Summary Judgment (doc. #33) is OVERRULED.

The CAF has engaged legal counsel to unsuccessfully set forth every conceivable argument, and then some, as to why it should have ownership of the F-82 irrespective of the terms and conditions in the Certificate. Perhaps the CAF could better expend its valuable resources either reaching an agreeable outcome with the USAF or for "freight and transportation charges" to return the F-82 to the USAF.

The Court has reviewed the Parties' Briefs on their Motions for Summary Judgment, the accompanying Rule 56 evidence and the record as a whole. Based upon a reading of these documents, oral argument would not aid the decisional process. Accordingly, the CAF's request

for oral argument is denied and the pending Motions are decided on the Briefs. Finally, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

      **DONE** and **ORDERED** in Dayton, Ohio, this First day of July, 2008.

**s/Thomas M. Rose**

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record